If he pleases the court, good morning. My name is Jameel Wernicke. This is my first time here. As you can tell, I'm a little nervous. We don't bite. If I make a mistake, I hope the court will forgive me. I would like to reserve two minutes for the public. I will start by pointing out that there are two main factors that determine the boundaries of the court's review of the factual issues here, as the district court and the administrative law judge looked at them. The first one is that the picture didn't change for the claimant until he was diagnosed with HIV, and that took place in October of 2006. He had significant medical problems prior to that, as the record shows. He did not file a claim, but once he was diagnosed with HIV, and once he started HIV medication, the picture changed. Also, the claimant went back to work in 2008, so we're not talking somebody who wanted to milk the system. He went back to work January 6, 2008. What he did after 2008, January 6, how he's functioned well or not well after that date is totally irrelevant. I say that because if the court looked at the record, they would notice that Judge Brown, the administrative law judge who heard this case, during his direct examination of the claimant was asking him questions about what his current functions were, and twice Judge Brown was advised that this was a close period of disability. Judge Brown still continued asking questions about the claimant's current activities and symptoms and limitations, and when the court looks at Judge Brown's decision in terms of the activities that he used to discredit the claimant, some of them, like playing basketball or racquetball, were what the claimant was doing two years post the close period of disability. Well, let's just think about it from a logical perspective. If somebody says that I'm not able to do any job, and then subsequently goes back to work and leads a physically active life, then the logical question is, well, how did things get better, and is there any evidence of his condition having been worse before than it was later? Yes, Your Honor, thank you for your question. Yes, there was, because his medications, HIV medications, when he first started taking those medications, had severe adverse effect. The commission does not dispute that fact. The district court does not dispute the fact that he suffered significant diarrhea. He suffered significant fatigue. He had severe depression as a result of the medications he was on. But as the medications effectiveness began to improve, and through his own effort to rehabilitate himself by going to AA meetings, NA meetings, taking depression medications and various other remedies, he was able to improve his function to the point of January 6, 2008, he went back to work. So there was a period during which he was, the medications were not effective because he just started taking the AIDS medication. The commissioner cannot prove to this court that's nothing in the ALJ's record or decision or the district court decision that dispute that he had these symptoms. Now, what the district, what the ALJ did is, in addition to using the activities, the claimants engaged in two-year posts, he also isolated incidences in which, for instance, the claimant shopped for groceries. Well, he shopped for groceries twice, once every two weeks. So is your position essentially that the credibility finding was unsupported? The credibility findings were unsupported, but I got distracted slightly. Again, I apologize because of my inexperience. I think the two key elements here are the ALJ's application of the grid. The grid application here is totally in violation of well-established principles by this court. Also, since the ALJ found that the claimant suffered from fatigue, the commissioner argued lower that the claimant didn't suffer from fatigue. But the ALJ found he suffered from fatigue. Once the ALJ found he suffered from fatigue, he was required to assess the functional limitations related to fatigue. All the ALJ said was, well, I found he suffered from fatigue, but it does not change my determination that he can do light work. Well, this court told us in various cases that light work only deals with definition of light work in the DOT, only deals with the physical requirements of work. It's called the exertional requirement. It doesn't deal with the non-exertional requirement. And it doesn't take a medical expert to figure out that somebody who suffers from fatigue suffers both physical limitations and non-physical limitations. For instance, they might want to take a nap because they're tired, or that they can concentrate for a certain period of time and then decided, well, I can no longer concentrate and take a break. The ALJ made absolutely no assessment related to the fatigue. Now, if the court... Well, I'm not so sure that's true. Wasn't there a conclusion or a... Wasn't it cited that your client in contemporary medical records had given descriptions that were inconsistent with what he was offering up as the severe fatigue? Well, Your Honor, if you look at the ALJ's decision and the district court decision, what they cited were instances, for instance, he shopped for grocery. That's what they cited. Instances that he went to AA meeting. That's what they cited. They cited the fact that he drove some of the AA members to AA meeting. That's what they cited. Well, they also... I'm looking now. This is the... I think it's the district court for the magistrate judge's important recommendation. The ALJ rejected Angulo's testimony to the extent inconsistent with the RFC assessment because Angulo had denied that degree of fatigue in medical records and goes on and stated he was able to perform activities such as some of the things you cited. Well, for the first part, it isn't just that he went to AA meeting or went to a gym. This says Angulo had denied that degree of fatigue in medical records. Because the particular record the district court cited was before he started taking medication. Nobody disputes that fatigue is a result of the medication he's taking for AIDS. So they cited his statement before he started taking medication, and if you look at the ALJ's decision and the district court's decision, you'll find there's no reference in that record that they could point to that the claimant denied suffering from fatigue. The ALJ found, and I think that's the key, Your Honor, the ALJ found that he did in fact was suffering from fatigue. In fact, he called it problematic. So once he found that, then he had a responsibility to assess the limitation, and that's what the government on regulation says he should do. Well, I'm looking at the ALJ's decision. Page 6, I think it may be record page 14. Records under Exhibit 15F additionally reflected the claimant denied symptoms such as fatigue or diarrhea. That's before he started taking AIDS medication. If you look at the record he referenced, that was before January. He started taking AIDS medication January of 2007. So any reference to him denying that was because at that time he had not started taking the AIDS medication that was responsible. His claim covers that same time period too. His claim reaches back to October of 2006. Well, yes, no, no, Your Honor. The claim was amended at the administrative hearing. It was amended, and if you look at the amended time period, it is from January 31, 2006 to January 6, 2008. Now, granted that he filed the claim after he found out that he was diagnosed with HIV, well, not actually after, several months after actually, after he was diagnosed with HIV, and the effect of the HIV began to weaken him. Initially he didn't want to take medications because he wanted to find out how well he felt. But as the virus began to wreak havoc, so he decided to go on medication. So, yes, the time period that is being considered is only three months removed from when he started taking the AIDS medication. But the reference that the evidence that the DALJ cited and the district court cited in regards to fatigue and him not, him sleeping, all predate the date that he started taking the AIDS medication. And I think that is the key in deciding whether or not the DALJ's decision is substantially justified or supported. Now, another key point I would like to make to the court is that the DALJ, in looking at the mental limitations related to the Clement's depression, they have had history of depression. The DALJ then adopted the functional limitations that the state agency physician provided. Granted that below, the Clement did not challenge the state agency's determination as related to his mental illness. But the key here is that the state agency actually found that the Clement, and that is on volume two, Clement's excerpt, page 199. On the 11th question, the ability to complete a normal work day and a normal work week without interruption from psychological-based symptoms and to perform at a consistent pace without unreasonable number and length of rest period, unreasonable number and length of rest period. The state agency physician determined that in that category, the Clement was moderately, markedly limited. When you look at the DALJ's decision, even though he adopted the state agency's functional limitations as related to mental illness, he did not take that into consideration. If you apply that, it invalidates the grid. The courts have said that in various cases. So the key here are not only that the grid does not apply because he had various limitations, including the fact that the DALJ found that he cannot work in a job that required contact with the public. It has to be a job like janitorial work. That is in isolation. Now, if a vocational expert had come back and looked at those limitations and said, yes, he could do all this work, we wouldn't be here. But DALJ applied the grid. The grid does not apply. And in the final analysis, I would also like to point out that DALJ and the district court improperly relied upon social security in ruling 85-15. It has no application here. That deals with assessing functional limitations. It has nothing to do with the grid. And the rule makes it very clear that it has nothing to do with the grid. But let me just make sure I understand. With respect to the use of the grids, the principal non-exertional limitation that you are asserting the ALJ failed to take into account is what? One, he did not account the grid does not account for non-public work. So because the ALJ found that the claimant could do a broad range of light work. Well, if it only consists of exertional limitation, the ALJ would be right. But he also found that he cannot do non-public work. He also found that he has sensitivity to environmental factors. He also found that the claimant can only simple work, which means unskilled work. And there are court cases that said that simple, unskilled work does not in itself justify relying on the grid because there isn't a level for light work, the broad scope of light work. Some of them exceed that that is contemplated. So in this case, I'm saying that also the fact that the mental limitation the state agency indicated also invalidates the claim. Thank you. Thank you. We'll hear from the government. May it please the Court. My name is Susan Smith, and I am here representing the Commissioner of Social Security. The government's position is here that the ALJ reasonably assessed claimant within a residual functional capacity for a broad range of light work, which included non-public and simple repetitive tasks. This assessment afforded claimant every benefit of the doubt, given that claimant submitted minimal medical records that deal with the relevant period here from October 25, 2006 to January 6, 2008. And, in fact, a thorough review of those medical records show that, really, there are no additional limitations that could be supported by that record. Indeed, there's no medical source opinion in the record that would indicate that claimant had any greater limitations than those that the ALJ found in his RFC. Furthermore ---- Why don't you speak specifically to the example that the claimant has just cited? He's pointed to the state agency RFC assessment. Yes, Your Honor. That would be Dr. Gregg's assessment. And it's true Dr. Gregg completed a mental residual functional capacity assessment. He did indicate moderate limitations in his summary conclusion sections, which you'll find on page 198 and 199 of the record. And then there is a final section, section 3, which says functional capacity assessment. And on that page he refers you to the next form. And if you turn to page 202 ---- We also work for the government. Forms we understand. We're used to them. We may not understand them. And if you look at page 202, Dr. Gregg agrees that claimant can perform SRTs, which would be simple repetitive tasks, NP, nonpublic. And that is exactly the assessment that the ALJ adopted in his RFC finding. Could you translate the conclusion into English? On 202, the one you just pointed us to? SRTs, simple repetitive tasks. Okay. And NP stands for nonpublic. And that means what exactly? Work that does not deal with interacting with the public. And if you go on it says he considered decreased social functioning secondary to a history of paranoia and depression. And no, there was no vocational expert that was ever ---- There was no vocational expert in this case, but in cases where a person's residual functional capacity assessment, in this case light work, is not significantly limited by non-exertional impairments, the ALJ is not required to consult a vocational expert. He can rely on the GRIDS as a framework. Well, you know, but it just seems like there are a lot of non-exertional impairments here. There are. Yeah. If you review the ALJ's decision, you can see that he did thoughtfully consider these non-exertional limitations, and I can go through them individually. For example, the nonpublic contact. If you look at the Social Security's regulation that lists what are the basic functions of work, that would be 20 CFR 416.921. Public contact is not listed there. The ability to interact with supervisors and coworkers would be a basic work activity, but working with the public is not one of them. So a limitation that precludes him from working with the public doesn't even impact the assessment of whether he can still perform basic work activities. Again, SSR 8515 specifically discusses the fact that unskilled work, which is the only thing that the GRIDS address, the GRIDS only address the existence of unskilled jobs, deals with, these jobs deal with things rather than people. Likewise, the limitation to simple repetitive tasks. Many district courts in this jurisdiction, if you've considered the question, have found that a limitation to unskilled work takes care of a limitation to simple repetitive tasks. Again, he also had a limitation to some occasional postural activities. And again, if you look at SSR 8515, you can see that those do not significantly impact the world of light work. For example, crawling and kneeling are relatively rare. Climbing and balancing, again, also not a significant limitation at the light work level. And finally, he did also have a limitation that precluded him from concentrated exposure to fumes, odors, dust, gases, poor ventilation, and concentrated exposure to hazards. And again, those are both addressed by SSR 8515. And 8515 says that they don't ordinarily have an impact on the whole world of work because there aren't a whole lot of jobs that require exposure to concentrated dust and irritants, for example. If the panel has no... So what could he do?  He can't be in any place that has irritants. He could do simple repetitive tasks. Right, well, that is the very question that the GRIDs are meant to address without having to identify specific jobs. And in this case, I would point out that he wasn't prohibited from being around any dust or irritants but just concentrated exposure, which SSR 8515 does specifically address. If I may, I did want to address one more point that Council raised, which was that Council spoke about the fact that the ALJ relied on testimony about claimants functioning outside of the relevant period, but I would point out that the Claimants Council did specifically ask him to testify about his limitations and abilities during the relevant period, and he did do so, and the ALJ did consider that. But as I recall, he testified that he wasn't engaged in playing racquetball and whatnot during the closed period, and yet the ALJ appears to cite testimony about what happened later as a basis for discrediting his testimony with regard to fatigue during the closed period. It's true, the ALJ does reference his testimony about racquetball, but the record is replete with other examples of things that claimant did do during the relevant period, and those are listed in detail in our brief, but among them would be joining a gym, visiting with friends several times a week, not only attending, I believe he said, sober support groups three to ten times per week, but he was also volunteering, giving other people a ride to those. He was selling nutritional supplements, or any number of activities that he was clearly performing during the relevant period. And if there are no further questions, the government will just respectfully ask that you affirm that Commissioner's final decision. Thank you for the argument. We'll hear rebuttal. Thank you, Justice. I just want to reemphasize the Commissioner's reliance on the 85-15. 85-15 addresses procedural functional limitations, how to assess procedural functional limitations, and what impact it has on the broad universe of work, not light work in particular, which is what the ALJ found. It implied it could do sedentary, light, medium, and heavy, only light work. So if what we're talking about is that the claimant only has those limitations, then the ALJ would be correct. But we're talking about application of the grid. How does that reduce the number of jobs that the claimant can do in that exertional category? 85-15 does not apply to that particular question. And finally, the Commissioner made a reference to the bending, crawling, and all that. But he made no mention of bending. Light work requires bending. And the regulation is clear that those type of limitations invalidates the grid. And for those reasons, and for the reasons outlined in the opening brief, the claimant respectfully requests that this case be remanded added for word of benefit for further proceeding. Thank you, Judge. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted. That concludes our calendar today. We're adjourned.
judges: Schroeder, Noonan, Clifton